# Supreme Court of Texas

—————

No. 24-0892

—————

Office of the Attorney General,

*Appellant*,

v.

PFLAG, Inc.,

*Appellee*

—————

On Direct Appeal from the
261st Judicial District Court, Travis County

—————

**Argued October 7, 2025**

CHIEF JUSTICE BLACKLOCK delivered the opinion of the Court.

Justice Sullivan did not participate in the decision.

The Attorney General's office suspects that medical providers may have violated the Deceptive Trade Practices Act (DTPA) by misrepresenting to insurance companies the nature of the services they provide. An affidavit submitted by a corporation in related litigation caused the Attorney General's office to believe the corporation may have information shedding light on these potential DTPA violations. To obtain the documents underlying the affidavit, the Attorney General's

office invoked its statutory power to issue a "civil investigative demand" (CID). *See* TEX. BUS. & COM. CODE § 17.61. A CID requires "any person" the Attorney General's office believes "may be in possession, custody, or control of the original copy of any documentary material relevant to the subject matter of [a DTPA] investigation" to "produce the documentary material and permit inspection and copying." *Id.* § 17.61(a). Whether or not litigation is pending, a CID may seek "documentary material which would be discoverable under the Texas Rules of Civil Procedure." *Id.* § 17.61(c).

Rather than produce the requested information, the corporation invoked its statutory right to petition a district court to "modify or set aside the demand, stating good cause." *Id.* § 17.61(g). The Attorney General's office responded by narrowing its demand, but the corporation continued to resist the CID. The parties could not reach agreement, so their dispute over the document request came before a district court.

Nothing about the scenario described above is unusual or remarkable. The Attorney General's office frequently investigates DTPA violations, and it frequently issues CIDs in so doing. Parties often resist them. Even more frequently, district courts are called upon to officiate disputes over the production of documents. In purpose and in practice, a CID is closely analogous to a discovery request in civil litigation, and the CID statute makes clear that the two are subject to similar considerations. *Id.* § 17.61(c). In both instances, a party is generally entitled to relevant, non-privileged information in the other party's possession, but courts should ensure that production of privileged material is not compelled and should protect parties from

2

unnecessarily burdensome, invasive, or harassing demands. *See* TEX. R. CIV. P. 192.3(a), 192.6(b). Whether a discovery dispute arises from a CID or from civil litigation, the appropriate judicial tools for its speedy resolution are well known.

Although this matter could have been handled much like a conventional discovery dispute, it was not. It remained pending in the district court for over a year, during which time the corporation's section 17.61(g) petition was used as a way to put the Attorney General's investigation on trial—rather than as a way to obtain speedy judicial rulings on recognized discovery objections. The district court eventually issued a final order broadly protecting the corporation from production of several categories of material. This direct appeal, to which the Attorney General is entitled by statute, followed.

The lengthy history of this discovery dispute no doubt owes to its underlying subject matter, which is the Texas Legislature's ban on transgender treatments for minors. *See* TEX. HEALTH & SAFETY CODE § 161.702. But the CID was not subject to a more searching judicial inquiry merely because of its politically sensitive topic. Nor does the constitution require courts to approach the topic with heightened scrutiny. While this case was pending in the district court, this Court upheld Texas's ban against a challenge brought under the Texas Constitution. *See State v. Loe*, 692 S.W.3d 215 (Tex. 2024). Since then, the United States Supreme Court has affirmed the validity of a similar ban under the U.S. Constitution. *See United States v. Skrmetti*, 605 U.S. 495 (2025).

The prohibition on transgender treatments for minors enacted by the Texas Legislature is the law in this State. As with any other law governing the medical industry, if the Attorney General reasonably believes that doctors or hospitals are using deceptive practices to avoid detection of their violation of the law, he may use the tools available to him to investigate the matter. In any such investigation, courts should be sensitive to the privacy interests of those whose intimate medical information could be revealed, but in this case the Attorney General has already agreed to allow redactions to preserve anonymity. On top of that, the DTPA provides an additional layer of protection by prohibiting the Attorney General's office from disclosing material it obtains through a CID unless doing so is "necessary in the enforcement of [the DTPA]." TEX. BUS. & COM. CODE § 17.61(f). Thus, if the corporation is correct that its responsive documents have nothing to do with the Attorney General's DTPA investigation, the law will shield the (already anonymized) documents from public disclosure.

Whether or how vigorously the Attorney General's office *should* pursue investigations of this nature are political questions entrusted by the Legislature to the Attorney General, not to the courts. Courts are well suited to resolve discovery fights. Courts are not well suited to second-guess the wisdom of investigatory decisions made by an elected executive officer entrusted by the law with broad discretion.

As explained below, the district court's rulings protecting the corporation from the requested discovery and enjoining further investigation by the Attorney General cannot stand. The district court's "Final Declaratory Judgment and Injunction" is reversed, and the

4

matter is remanded for proceedings consistent with this opinion. On remand, the corporation must produce responsive documents as described herein, subject to assertions of a recognized privilege supported by a privilege log as required under Rule 193.3 of the Texas Rules of Civil Procedure.

## I.

## A.

Texas law prohibits medical treatments for children if administered "[f]or the purpose of transitioning a child's biological sex" or "affirming the child's perception of the child's sex if that perception is inconsistent with the child's biological sex." TEX. HEALTH & SAFETY CODE § 161.702. This law, also known as SB 14, was signed by the Governor on June 2, 2023 and took effect on September 1, 2023. SB 14 charges the Attorney General with its enforcement. *Id.* § 161.706(a).

PFLAG, Inc. is a nonprofit corporation describing itself "as a resource for LGBTQ+ people, families, and allies." It is incorporated in California but has many chapters and over a thousand members in Texas. In the summer of 2023, PFLAG joined several other parties in a lawsuit seeking to enjoin enforcement of SB 14. During the early stages of that litigation, PFLAG's executive director, Brian Bond, submitted an affidavit stating that, after SB 14's passage:

> New families showed up in droves for chapter meetings and support groups, seeking information and support. Chapters planned and participated in events to provide comfort to and celebrate the unbreakable joy of the gender diverse community. PFLAG families with transgender and nonbinary adolescents shared their contingency plans— those with the resources to move or seek care out of state have begun firming up their plans to do so, while the vast

5

majority without those resources have been asking chapters for alternative avenues to maintain care in Texas. Families were not just seeking health care providers who specialize in medical care for gender dysphoria but leads on affirming general practitioners as well so that their adolescents would have access to multiple providers in the event that their primary providers stop providing gender-affirming medical care or leave the state as a result of SB14.

The lawsuit in which this affidavit was submitted led ultimately to this Court's June 2024 decision upholding SB 14. *See Loe*, 692 S.W.3d 215.

Since SB 14's enactment, the Attorney General's office has sought to determine whether medical providers are misleading insurers and others by billing treatments outlawed by SB 14 as treatments for lawful purposes. In this regard, the Attorney General's office has employed its investigatory authority under the DTPA in conjunction with its investigatory authority under SB 14. *See* TEX. BUS. & COM. CODE § 17.47.[1] Investigations of this nature have generated at least three lawsuits filed by the State against doctors alleged to have violated the DTPA by prescribing hormones to minors in violation of SB 14 and then deceptively billing insurance companies for treatment of "endocrine disorders" or other conventional-sounding ailments.[2]

According to the Attorney General's office, the Bond affidavit— particularly its reference to conversations after the passage of SB 14

---

[1] The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM. CODE § 17.46(a).

[2] *State v. Lau*, No. 493-07676-2024 (493d Dist. Ct., Collin Cnty., Tex.); *State v. Cooper*, No. 493-08026-2024 (493d Dist. Ct., Collin Cnty., Tex.); *State v. Granados*, No. 118832-422 (422d Dist. Ct., Kaufman Cnty., Tex.).

about "alternative avenues to maintain [transgender] care in Texas"—gave rise to a belief that PFLAG may be in possession of information relevant to the office's investigation of DTPA and SB 14 violations by medical providers. On February 5, 2024, while the *Loe* case was pending in this Court, the Attorney General's office issued a CID to PFLAG seeking documents supporting the Bond affidavit as well as other related categories of documents. The CID demanded:

1. All Documents and Communications that form the basis of, or relate to, Brian K. Bond's personal knowledge of the information contained in the [Bond affidavit].

2. All Communications to, or from, any PFLAG representative regarding, relating to, or referencing, "contingency plans" and/or "alternative avenues to maintain care," as those phrases are used in the [Bond affidavit].

3. All recommendations, referrals, and/or lists of pediatric and/or adolescent "health care providers" (as that term is used in paragraph 13 of the [Bond affidavit]) in Texas, that PFLAG (or any of its representatives) has created, maintained, received, or distributed since March 8, 2023.

4. All communications to, or from, Brian K. Bond regarding, or relating to, the contents and preparation of the [Bond affidavit].

5. In reference to the [Bond affidavit], produce all Documents, meeting minutes, and Communications that support Brian K. Bond's sworn statement that "PFLAG families with transgender and nonbinary adolescents . . . have been asking chapters for alternative avenues to maintain care in Texas."

6. All communications to, or from, any PFLAG representative regarding, relating to, or referencing any

7

of the individuals or entities identified in the document attached here to as "EXHIBIT B2" since March 8, 2023.

7. Any and all contractual and charter agreements between PFLAG's Texas chapters and national chapter.

8. The governing documents and bylaws of PFLAG's Texas chapters and national chapter.

**B.**

On February 28, 2024, PFLAG filed a petition in Travis County district court seeking protection from the CID pursuant to section 17.61(g) of the DTPA, which authorizes a CID recipient to file "a petition . . . to modify or set aside the demand, stating good cause." On March 1, the court granted a TRO after hearing argument from both sides. On March 19, the Attorney General's office offered a revised, somewhat narrowed version of the CID. Most notably, the revised CID disclaims any desire to obtain information identifying the members of PFLAG whose communications with the organization are described in Bond's affidavit:

> Unlike the [original] CID, the foregoing, operative [revised] CID does *not* request that PFLAG produce documents and information disclosing the identity of its Members and/or actual membership lists, either in whole or in part, in any form. For this reason, PFLAG may elect to redact or anonymize any portion of a document otherwise within the scope of the [revised] CID that contains information disclosing or providing the identity of any Member.

With this caveat, the revised[3] CID requested the following:

---

[3] As compared to the original CID, the revised CID eliminated Request #4 for "[a]ll Communications to, or from, Brian K. Bond regarding, or relating to, the contents and preparation of the [Bond affidavit]." Request #1 was narrowed to seek documents relating to "Bond's personal knowledge of the

8

1. All documents and communications that form the basis of, or otherwise relate to, Brian K. Bond's personal knowledge of the information stated in paragraphs 7 and 13 of the [Bond affidavit].

2. All communications to, or from, PFLAG's professional staff, non-members, or Affiliates regarding, relating to, or referencing, "contingency plans" and/or "alternative avenues to maintain care," as those phrases are used in the [Bond affidavit].

3. All recommendations, referrals, and/or lists of pediatric and/or adolescent health care providers in Texas that PFLAG (or any of its professional staff or affiliates) has created, maintained, received, or distributed since March 8, 2023.

4. In reference to the [Bond affidavit], produce documents, meeting minutes, and communications sufficient to show the factual basis for the statement that "PFLAG families with transgender and nonbinary adolescents . . . have been asking chapters for alternative avenues to maintain care in Texas" (with PFLAG having the option to redact identifying member information in the manner described in Instruction No. 7).

5. All communications to, or from, PFLAG's professional staff, non-members, or Affiliates regarding, relating to, or referencing any of the individuals or entities

---

information contained in paragraphs 7 and 13 of the affidavit" rather than documents related to the entire affidavit. Request #2 was narrowed by replacing the communications of "any PFLAG representative" with the communications of "PFLAG's professional staff, non-members, or Affiliates." This had the effect of excluding the communications of rank-and-file PFLAG members. Request #3 and Request #5 (previously #6) were similarly narrowed. Finally, Request #4 (previously #5) was narrowed by replacing the demand for "all [documents] that support" Bond's statement about "alternative avenues to maintain care in Texas" with a demand for documents "sufficient to show the factual basis for" Bond's statement.

identified in the document attached hereto as "EXHIBIT B2" since March 8, 2023.

6. All contractual and charter agreements between PFLAG's Texas chapters and national chapter.

7. The governing documents and bylaws of PFLAG's Texas chapters and national chapter.

Since proposing the revised CID in March 2024, the Attorney General's office has consistently disclaimed any desire to revive its original CID or to obtain information that would identify individual PFLAG members.

On March 25, 2024, the district court issued a temporary injunction protecting PFLAG from any production. On April 12, the Attorney General's office filed a counterclaim seeking enforcement of its revised CID under section 17.62(b) of the DTPA, which authorizes petitions to enforce a CID. On May 8, the court held a hearing on the counterclaim but took no action. On June 10, the court held a trial on the merits, over the Attorney General's objection that no trial was necessary.

On September 13, the court issued a letter ruling agreeing with PFLAG's proposed modifications to the original CID. At no point throughout the proceedings was PFLAG required to submit a privilege log or to tender any documents for the court's review. The Attorney General's office interpreted the September 13 ruling as a final order on both PFLAG's petition to modify the CID under section 17.61(g) and on its own petition to enforce the CID under section 17.62(b). On the latter score, section 17.62(c) of the DTPA authorizes a direct appeal in the Supreme Court of "[a]ny final order entered" on a section 17.62 petition

10

for enforcement by the Attorney General.[4] The Attorney General sought direct review by this Court under that provision by filing a notice of appeal on October 10, followed by a Statement of Jurisdiction on October 21. PFLAG responded that no final order had been entered, relying in part on the district court's October 14 letter to the parties, which disclaims the finality of the September 13 ruling.

Rather than resolve the dispute over the import of the September 13 ruling, on February 7, 2025, we abated the appeal and directed the district court to cure any potential jurisdictional defect by issuing a final order on the Attorney General's petition for enforcement. The district court did as requested on March 10, 2025. Its "Final Declaratory Judgment and Injunction" finally disposes of both PFLAG's section 17.61(g) petition to modify or set aside the CID and the Attorney

---

[4] Although an appeal of a final order on a petition to enforce a CID may be filed directly in this Court, a petition to set aside or modify a CID is subject to appeal through the normal channels in a court of appeals. In April 2024, the Attorney General's office appealed the district court's temporary injunction through that normal channel to the Third Court of Appeals. That court granted relief under Texas Rule of Appellate Procedure 29.3 protecting PFLAG from production during the pendency of the appeal. *OAG v. PFLAG, Inc.*, No. 03-24-00241-CV, 2024 WL 1662035, at *1 (Tex. App.—Austin Apr. 17, 2024, order). The court then abated the appeal at the request of the Attorney General's office. In September 2024, the case was transferred to the newly created Fifteenth Court of Appeals. In April 2025, the parties filed a joint motion to dismiss the appeal, which they agreed was mooted by the district court's final order. The court granted the motion. *OAG v. PFLAG, Inc.*, No. 15-24-00044-CV, 2025 WL 1322588, at *1 (Tex. App.—15th Dist. May 6, 2025, no pet.). We are aware of no related activity in the courts of appeals since that time.

General's section 17.62(c) petition for enforcement of the CID.[5] The judgment in PFLAG's favor contains detailed findings of fact and conclusions of law directed at the *original* CID. Although the Attorney General's office abandoned the original CID in favor of the revised, narrowed version, the district court decided the revised CID was not properly before it.

The final order set aside most of the original CID. It also included a permanent injunction barring the Attorney General from demanding documents other than those the court previously ordered produced—

---

[5] As noted, our direct-appeal authority in this matter comes from section 17.62(c) of the DTPA, which provides: "Any final order entered [on a section 17.62 petition to enforce a CID] is subject to appeal to the Texas Supreme Court." The district court's "Final Declaratory Judgment and Injunction" is unquestionably a final order on the Attorney General's petition to enforce the CID, triggering our direct-appeal authority. It is also other things, however, including a final order on PFLAG's section 17.61(g) petition to modify or set aside the CID—an order which would not, on its own, be subject to direct appeal in this Court. Fortunately, we need not parse the final order and review only portions of it. It will rarely be possible, much less fruitful, to attempt to disentangle the issues raised by dueling petitions of this nature. It is certainly not possible here. Whether at the trial or appellate level, a court cannot properly rule on the government's entitlement to enforce a CID without also considering the CID respondent's corresponding right to resist the CID. Perhaps for this reason, the statute clarifies that enforcement petitions under section 17.62 vest the court with authority not merely to decide the discrete matters raised in the enforcement petition but also "to enter any order required to carry into effect the provisions of Sections 17.60 and 17.61 of this subchapter," which includes the CID respondent's right to modify or set aside the CID for good cause. TEX. BUS. & COM. CODE § 17.62(c). All of this is then directly appealable to the Supreme Court after entry of a final order on the enforcement petition. *Id.* In this case, the entirety of the district court's final order is an effort to "carry into effect the provisions of Sections 17.60 and 17.61," which cannot be disentangled from the court's denial of the enforcement petition. The entire final order is therefore properly before us in this direct appeal.

which, if binding, had the practical effect of blocking the revised CID or any later CID.[6] After receiving notice of the final order, we noted probable jurisdiction, ordered briefing, and heard argument. *See* TEX. R. APP. P. 57.1–.6.

## II.

Two threshold errors affected the district court's analysis, and resolution of these errors largely resolves the dispute. First, the court analyzed the wrong version of the CID. Second, the court failed to credit the Attorney General's office's reasonable interpretation of the Bond affidavit and to appreciate the affidavit's connection to the office's investigation of possible DTPA violations. After addressing these threshold questions, we will turn briefly to the individual document requests.

## A.

The agreement by the Attorney General's office to the revised, narrowed version of the CID should have made further consideration of the original CID superfluous. Instead, more than a year after the Attorney General's office offered a less intrusive alternative to the original CID, the district court remained concerned with the propriety of the original CID. Indeed, the final judgment is directed only at the original, abandoned CID—not the revised, live CID. In the district court's view, the revised CID was not before it because PFLAG's petition challenged the original CID and because the revised CID had not been

---

[6] The final order also set aside the CID's "Demand for Sworn Written Statement" pursuant to section 17.60(1). The Attorney General's office does not seek review of this ruling, instead focusing its appeal solely on the CID's document requests.

13

formally served on PFLAG through the procedures required by the DTPA. That was incorrect. As in other litigation contexts, continued judicial concern with matters no longer in dispute wasted the parties' resources and the court's.

Whether it is the Attorney General using a CID or parties in civil litigation using the discovery rules, the party seeking to compel discovery will frequently respond to the producing party's objections by agreeing to narrow its demand. Only after negotiating in pursuit of any points of compromise do the parties need to seek the court's involvement. When the parties cannot agree, the court's concern is with their continued points of disagreement, not with the validity of the original demands.

This familiar aspect of discovery practice is no less applicable in the context of a CID than it is in traditional civil discovery. When litigation over a CID becomes necessary—whether through the recipient's petition to set aside or modify the CID under section 17.61(g) or through the Attorney General's petition for enforcement under section 17.62—the court's job is to officiate the parties' remaining disagreements, not to pass judgment on the abandoned positions from which the parties began.

To put the matter in the statute's terms, when the Attorney General's office agrees to narrow its CID or when the recipient agrees to produce information, a court then has "good cause" to "modify" the CID to reflect the parties' agreement. TEX. BUS. & COM. CODE § 17.61(g). Likewise, in a section 17.62 enforcement proceeding, the court's power to "enter any order required to carry into effect the provisions of Sections

14

17.60 and 17.61" includes the power to adjust the CID to reflect either party's willingness to adjust its position. *Id.* § 17.62(c). Nothing in the statute remotely suggests that the entire proceeding is tied to the mast of the original CID unless the Attorney General formally serves an amended CID on the recipient. Instead, as in conventional discovery disputes, the court may adapt its rulings to reflect changes in the parties' positions as the litigation develops.

Applying these basic principles here, the Attorney General's willingness in March of 2024 to allow redaction of information identifying any PFLAG members and to otherwise narrow its demand should have removed the original CID from the picture. The obsolescence of the original CID became even clearer when the Attorney General filed an enforcement petition in April 2024 seeking enforcement of the *revised* CID, not the original one. The district court nevertheless proceeded to rule only on PFLAG's objections to the original CID.

This procedural error did not result merely in expense and delay. It also caused the court to misperceive the extent to which the CID impacted individual PFLAG members, whose intimate, private medical information could be revealed by public disclosure of their communications with PFLAG. The Attorney General's agreement, reiterated in this Court, to allow redaction of information identifying the children or families who communicated with PFLAG—its agreement, in its own words, to let PFLAG "anonymize" the documents—obviates any valid concerns about medical privacy. As we understand the revised CID, the Attorney General's office has disclaimed any request for information that would identify individual children or families who

15

sought assistance from PFLAG, and it has agreed to allow PFLAG to make redactions to that effect.

With such an agreement in place, we are hard pressed to put much weight on the lingering privacy concerns PFLAG continues to assert, which are vague and ill-defined. There is no free-standing discovery privilege against disclosure of private communications. Nor do the First Amendment rights of free speech or association—or related provisions of the Texas Constitution—categorically shield from civil discovery communications that were intended to be kept in confidence. Recognized privileges exist, of course, such as for communications between lawyer and client, doctor and patient, or husband and wife.[7] But there is no recognized privilege protecting communications with a non-lawyer, non-doctor, private advocacy organization like PFLAG. PFLAG makes no focused argument to the contrary, instead broadly invoking the general protection of the First and Fourth Amendments without citing any authority supporting the kind of privilege it claims.[8]

---

[7] *See, e.g.*, TEX. R. EVID. 503 (attorney–client privilege), 509 (physician–patient privilege), 504 (spousal privileges).

[8] In addition to invoking the First Amendment, the district court held that the CID "infringe[d] the right to be free from unreasonable search and seizure under both the U.S. Constitution and the Texas Constitution" by "seeking information and documents that are not reasonably relevant to the purported purpose of the investigation and in failing to comply with the requirements of the DTPA." We disagree because, as we conclude below, the revised CID reasonably sought documents related to the Attorney General's valid investigation of efforts to deceptively conceal violations of SB 14. The district court's only basis for its holding was its conclusion, which we reverse, that the CID did not comply with the DTPA's statutory standards. We do not foreclose the possibility that, in another case, an aggressive CID could implicate unconstitutional-search concerns under the state or federal constitution.

16

With that said, we by no means dismiss PFLAG's privacy concerns as immaterial. The civil discovery rules instruct that courts may protect the target of discovery from "invasion of personal, constitutional, or property rights." TEX. R. CIV. P. 192.6(b). The DTPA contemplates judicial modification of a CID for "good cause," an open-ended standard whose precise contours we do not seek to define here—although the DTPA indicates that the civil discovery rules will generally provide useful guidelines. *See* TEX. BUS. & COM. CODE § 17.61(c). Whether in civil discovery or in response to a CID, courts should take seriously a claim that discovery of private, intimate communications is unduly burdensome, harassing, or otherwise deserving of judicial protection even if not technically privileged. It is enough for present purposes to observe that so long as the identities of PFLAG members are protected by the agreed redactions, production of documents reflecting the members' communications with PFLAG—to which the Bond affidavit refers—do not threaten the members' privacy.

Any threat to privacy is further ameliorated by the DTPA's command that the Attorney General's office may not disclose material it obtains through a CID to "any person" other than authorized employees of the office, unless the CID respondent consents. *Id.* § 17.61(f). This robust protection does not exist in civil discovery absent a protective order, but it attaches automatically to material submitted in response to a CID. As might be expected, the protection is subject to the authority of the Attorney General's office to use the material "as it determines necessary in the enforcement of [the DTPA], including presentation before any court." *Id.* Such use is the purpose of the CID process, after

17

all.  But the exception does not swallow the rule.  The Legislature has imposed on the Attorney General's office a strict obligation to prevent disclosure of CID materials except to the extent the disclosure is "necessary" for the enforcement of the DTPA, in court or otherwise.  This protection serves at least two important roles in the statutory scheme by (1) shielding CID recipients from dissemination of material that turns out not to be useful in DTPA enforcement, and (2) preventing the Attorney General's office from using CIDs for something other than their intended purpose.

If, as PFLAG vigorously maintains, none of the responsive documents would be useful in the Attorney General's DTPA investigation, we struggle to imagine how their further dissemination could ever be "necessary in the enforcement of" the DTPA.  *Id.*  In that scenario, the Attorney General's office would be statutorily prohibited from disclosing the material even to unauthorized employees within its own organization, much less to the public.

**B.**

Having established that the revised CID is our proper focus and that its provision for redactions adequately deals with any valid privacy concerns, we come to the crux of the parties' dispute over the content of the document requests, which is the Bond affidavit.  As explained below, we agree with the Attorney General's office that documents underlying the disputed portions of the affidavit *may* provide insight into the pursuit—by anonymous, redacted patients—of treatments by doctors who violated SB 14 and the DTPA.  Or they may not.  PFLAG objects that none of its responsive documents would corroborate any such

18

theory, and the district court agreed (without seeing any of the documents). Of course, a party seeking discovery is not obligated to believe the other party's assurance that its responsive documents are not interesting or incriminating. And, as noted above, if PFLAG is right that its responsive documents are immaterial to a DTPA investigation, then section 17.61(f) shields the documents from further dissemination, even within the Attorney General's office. With those observations in mind, we turn to the Bond affidavit.

**1.**

PFLAG participated in the *Loe* litigation as one of the plaintiffs seeking an injunction against enforcement of SB 14. In so doing, it submitted the affidavit of Brian Bond, its executive director. The affidavit's purpose was to aid PFLAG's pursuit of an injunction by demonstrating that SB 14 would cause PFLAG and its members irreparable harm. The key portion of the Bond affidavit reads as follows:

> New families showed up in droves for chapter meetings and support groups, seeking information and support. Chapters planned and participated in events to provide comfort to and celebrate the unbreakable joy of the gender diverse community. PFLAG families with transgender and nonbinary adolescents shared their contingency plans— those with the resources to move or seek care out of state have begun firming up their plans to do so, while the vast majority without those resources have been asking chapters for alternative avenues to maintain care in Texas. Families were not just seeking health care providers who specialize in medical care for gender dysphoria but leads on affirming general practitioners as well so that their adolescents would have access to multiple providers in the event that their primary providers stop providing gender-affirming medical care or leave the state as a result of SB14.

19

The parties take dramatically different views of this paragraph. As the Attorney General's office sees it, Bond's reference to conversations about "contingency plans" for "alternative avenues to maintain care in Texas" indicates that some of the discussions to which he refers may have contemplated the continuation of transgender treatments in Texas in violation of SB 14. PFLAG denies any such conversations took place. It maintains that the affidavit's reference to "alternative avenues to maintain care in Texas" refers only to treatments administered prior to the effective date of SB 14 or to treatments that are not illegal under SB 14.

The district court agreed with PFLAG's interpretation of the affidavit. On that basis, it concluded that the Attorney General's office had no valid basis to believe that documents underlying the Bond affidavit might aid the investigation of possible DTPA violations. As between the parties' competing interpretations of the affidavit, we need not take a side in order to observe that the district court erred by substituting its own interpretation of the affidavit for the Attorney General's. A court's authority to set aside or modify a CID for "good cause" is not a license for the court to substitute its own judgment about an investigation's likely fruitfulness for the reasonable judgment of the Attorney General's office.

The DTPA grants considerable, but not unlimited, investigatory discretion to the Attorney General's office. The office is entitled by

20

statute to issue a CID "[w]henever the consumer protection division[9] *believes* that any person *may* be in possession, custody, or control of the original copy of any documentary material relevant to the subject matter of an investigation of a *possible* violation of this subchapter." TEX. BUS. & COM. CODE § 17.61(a) (emphases added). In other words, the Attorney General's statutory CID authority is triggered not by demonstration or proof that the target of a CID has relevant material. It is instead triggered by mere *belief*. The district court should not have faulted the

---

[9] The "consumer protection division" is the department of the Attorney General's office traditionally charged with enforcing the DTPA. Whether a particular "division" of the Attorney General's office "believes" something is a question that can only be answered, in the end, by the leadership of the Attorney General's office. Like all parts of the Attorney General's office, the consumer protection division is ultimately headed by the Attorney General himself, typically through various deputies below the Attorney General in the chain of command. Any legislative attempt to place executive discretion in subordinates of the Attorney General without subjecting their decisions to the Attorney General's direction and control would raise obvious constitutional concerns. Because we do not perceive the Legislature to have done so here, we need not explore such questions. To the extent the district court was concerned with whether particular lawyers or groups of lawyers within the Attorney General's office—as opposed to the Attorney General himself or those he has authorized to speak for his office—believed PFLAG may possess relevant information, this inquiry was misdirected. By issuing the CID, the Attorney General's office formally stated its belief that PFLAG may be in possession of relevant material. Any judicial inquiry into whether this was truly the belief of the "consumer protection division" would be misplaced.

Likewise, inquiry into whether the consumer protection division (or anyone else) was *already* investigating the matter prior to the CID's issuance served no valid purpose. A decision by the Attorney General or his authorized agents to investigate possible DTPA violations provides an adequate basis, under the statute, for issuance of a CID regarding those possible violations. The investigation need not pre-date the CID. Rather, the CID itself is a sufficient indication that "an investigation of a possible violation of this subchapter" exists. TEX. BUS. & COM. CODE § 17.61(a).

21

Attorney General's office for failing to "produce evidence to suggest that PFLAG likely possessed information relevant to the OAG's investigation." Jdgmt. at 8. That was not the Attorney General's burden. Under the statute's plain text, belief—not proof—will suffice.

This relatively lenient standard reflects an investigatory reality. Often, an investigator will be unable to *prove* that the recipient of a CID has material that would aid a DTPA investigation without first seeing what the recipient has, which it cannot do without the CID. And as explained above, if the investigator's belief turns out to be wrong and the recipient's responsive documents are not useful in enforcing the DTPA, then section 17.61(f) shields them from disclosure.

This is not to say the Attorney General's office is entitled to issue a CID to *anyone* it *claims* to believe has material relevant to a DTPA investigation. There must of course be a reasonable basis for the belief, to which a reviewing court can be directed. But the question for a court, under this statutory scheme, is not whether the belief is true. The question is whether there is a reasonable basis for the belief, which allows the court to satisfy itself that the CID is not merely arbitrary, harassing, or punitive. If the Attorney General's office can proffer no reasonable explanation for why it believes the CID recipient may have information relevant to possible DTPA violations, a court would surely have good cause to set aside the CID. But if a reasonable person could share the Attorney General's belief that the recipient of the CID may have relevant material, then the courts should honor the judgment of the executive office entrusted by the Legislature with investigating such matters.

The CID statute indicates that, when the Attorney General's office issues a CID, it must have in mind one or more possible DTPA violations, against which the relevance of the requested material may be judged. *See* TEX. BUS. & COM. CODE § 17.61(a). In this regard, section 17.61(b)(1) requires the Attorney General's office to "state the statute and section under which the alleged violation is being investigated, and the general subject matter of the investigation." Subsection (b)(2) then requires the CID to "describe the class or classes of documentary material to be produced with reasonable specificity so as to fairly indicate the material demanded." In these ways, although no lawsuit has been filed, the statute contemplates a theoretical, "possible" DTPA lawsuit and essentially authorizes the Attorney General to issue a discovery request within that theoretical case. Subsection (c) explicitly confirms the statute's creation of a process akin to civil discovery: "A civil investigative demand may contain a requirement or disclosure of documentary material which would be discoverable under the Texas Rules of Civil Procedure." *Id*. § 17.61(c).

As in civil discovery, a reviewing court may police the breadth of the document requests to ensure they are tailored to seek material relevant to the subject matter of the investigation. If no responsive documents exist, then of course the CID recipient need not produce anything. But PFLAG does not deny that responsive documents exist. It denies that its responsive documents would aid investigation of a possible DTPA violation. Yet like any party seeking discovery, the Attorney General's office is not required to take PFLAG's word for what is in PFLAG's responsive documents. Under the statute, the Attorney

23

General's reasonable belief that the CID recipient's documents may be relevant to a DTPA investigation triggers the Attorney General's right to demand the documents. This right is subject, of course, to recognized objections such as privilege. And, crucially, if using the documents is not necessary for DTPA enforcement, the Attorney General's office may not disclose them to anyone. *Id*. § 17.61(f). But a party's assurance that its responsive documents will not be useful to the party seeking discovery is not a recognized objection.

It appears the district court did not review any of PFLAG's documents and instead deferred to PFLAG's assurances about their contents. This was error. But even if the court had reviewed PFLAG's documents, the statute does not empower the court to withhold documents responsive to a properly tailored CID based merely on the court's view that the documents are unlikely to aid a DTPA investigation. Subject to privilege and other recognized objections, the Attorney General's office is generally entitled to see the documents and make that determination for itself, as would a litigant in civil discovery. It is not, however, entitled to use or disseminate the documents in any way unless doing so is necessary for DTPA enforcement. *Id*. In sum, a court's job is to protect the CID recipient's recognized legal rights within this statutorily authorized discovery process—not to protect the CID recipient from the process itself.[10]

---

[10] Like the district court, we decline the Attorney General's invitation to import the "*Powell* factors" or other federal caselaw arising from the federal courts' experience handling objections to administrative subpoenas issued by federal agencies. *See United States v. Powell*, 379 U.S. 48 (1964). The DTPA plainly states the standards governing CIDs in Texas, which are not

24

**2.**

With the inquiry properly framed, we return to the contents of the Bond affidavit. In our view, there is little question the affidavit gave the Attorney General's office a reasonable basis to believe PFLAG may be in possession of documents relevant to an investigation into deceptive billing of treatments administered in violation of SB 14. Bond's reference to "contingency plans" for "alternative avenues to maintain care in Texas" suggests that the underlying documents *may* point investigators toward planned or actual violations of SB 14. Of course, they may not. But so long as it is reasonable to conclude that they *may*—as is the case here—the CID statute entitles the Attorney General's office to obtain the documents and judge their contents for itself.

The affidavit also refers to a search for "leads on affirming general practitioners" in case "primary providers stop providing gender-affirming medical care" because of SB 14. This statement could likewise be interpreted by a reasonable investigator to suggest that PFLAG may have documents regarding plans by some providers to continue offering or facilitating treatments in violation of SB 14. We

---

particularly complicated or difficult to apply, especially given the statute's helpful reference to the well-known rules governing civil discovery. *See* TEX. BUS. & COM. CODE § 17.61(c). We have summarized the statutory standards and attempted to elucidate them to the extent necessary to decide this matter. The federal courts' approach to similar questions may of course prove helpful in future CID litigation. To take one obvious example, if the information sought is already in the Attorney General's possession, there is no need for a CID, and a court would have good cause to set one aside. *See Powell*, 379 U.S. at 57–58. In all cases, however, the touchstone for a Texas court reviewing a CID under the DTPA should remain the text of the DTPA and the civil discovery rules, not federal caselaw.

need not reject the contrary, more innocuous interpretation of the affidavit adopted by PFLAG and the district court. The mere existence of competing, reasonable interpretations of Bond's statements in the affidavit—which no doubt were carefully worded for litigation purposes—was enough to trigger the Attorney General's statutory right to inquire further by obtaining the documents supporting Bond's statements. The district court's factual inquiry into what Bond really meant by his disputed statements or how likely it was that PFLAG's responsive documents (which were never proffered) would be relevant to a DTPA investigation complicated the proceedings unnecessarily and served no valid purpose.[11]

The district court correctly observed that the Bond affidavit says nothing about insurance or medical billing, that PFLAG does not

---

[11] The district court found "no basis in Texas law for an expedited proceeding" and thought the only way it could dispose of the petitions was by summary judgment or trial. We agree that summary judgment—but not a full trial on the merits—is an appropriate procedural vehicle for disposing of petitions filed under section 17.61 or 17.62. The summary process afforded need not be long or complicated. Evidentiary hearings will rarely be necessary. Discovery is generally inappropriate. These petitions raise what are essentially pre-suit discovery disputes, and they should not be allowed to blossom into a "case within a case," as seems to have happened here. Rather than analogize CID petitions to an original petition in civil litigation, as do PFLAG and the district court, we think the better analogy is to a Rule 202 petition for pre-suit discovery, a familiar tool for obtaining discovery without initiating all the procedural trappings of a civil lawsuit. *See* TEX. R. CIV. P. 202. Although Rule 202 contains few hard-and-fast limitations on the process a court may provide, it contemplates a simple, speedy proceeding culminating in a hearing and a final order. Depending on the timing, an initial, preliminary order may also be necessary to extend the CID recipient's response date until the court is able to promptly resolve the matter. No more should be needed to properly dispose of most CID petitions.

26

provide medical care, and that PFLAG is unlikely to have any information directly reflecting insurance fraud. The Attorney General's office does not vigorously contend otherwise. Instead, it suspects that medical providers who have violated SB 14 by continuing to provide prohibited treatments have concealed their illegal actions using deceptive billing or other deceptive practices. In order to identify doctors who have violated the DTPA in this way, investigators would first need to identify doctors who have provided treatments in violation of SB 14. The Bond affidavit provides a reasonable basis for the office's belief that PFLAG may have documents relevant to that inquiry, which is a necessary factual predicate to the suspected DTPA violations.

PFLAG objects that the timeframe of the document demands is not limited to communications post-dating the effective date of SB 14. The Bond affidavit, however, could suggest to a reasonable reader that discussions about how to circumvent SB 14 after the law went into effect began taking place earlier, when it became apparent the law might be enacted. The Attorney General's office acted within its discretion by taking that view of Bond's statements and proceeding to investigate accordingly.

As the district court acknowledged, the Attorney General's suspicion that medical providers have violated the DTPA to conceal their violations of SB 14 is far from fanciful. Three such prosecutions have already commenced. *See supra* note 2. The district court inferred from the existence of these prosecutions that the Attorney General's office is capable of enforcing SB 14 without obtaining documents from PFLAG. This was improper. The better inference points in the opposite

27

direction. The existence of multiple pending prosecutions of Texas doctors alleged to have violated the DTPA and SB 14 in exactly the manner contemplated by the CID buttresses the Attorney General's decision to use the investigatory tools at his disposal to determine whether additional prosecutions are warranted.

Before leaving the topic of the affidavit, we must also observe that by filing a lawsuit and submitting an affidavit supporting a request for an injunction, a party naturally subjects the matters stated in the affidavit to further inquiry by the counterparty. PFLAG of course has every right to seek legal redress against the State. But like any party, when it chooses to initiate litigation and then chooses to put certain factual matters at issue, it can hardly claim unfair burden or harassment when the opposing party seeks the documentary basis for its testimony. True, the CID arose apart from, and is not part of, the *Loe* litigation. But it remains the case that, by choosing to submit the affidavit, PFLAG voluntarily invited further inquiry by the Attorney General's office into the affidavit's contents. The privacy interests of PFLAG's members—individual families and children—are acknowledged by all sides and should be adequately protected by the Attorney General's agreement to allow PFLAG to anonymize the documents, as well as by section 17.61(f). But any privacy or constitutional interests asserted by PFLAG on its own behalf carry little weight given its decision to put the matters stated in the Bond affidavit at issue in highly public litigation.[12]

_____

[12] There is perhaps unavoidable tension between PFLAG's desire to strictly maintain the confidentiality of information it receives from its

## C.

The above discussion addresses the bulk of the objections advanced by PFLAG or adopted by the district court, many of which are aimed solely at the original CID and therefore immaterial to our inquiry. The remaining question is whether the document requests in the revised CID are properly tailored to seek discoverable information on the subject matter of an investigation of possible DTPA violations by medical providers concealing their continued provision of treatments in violation of SB 14.

The revised CID's first request seeks:

1. All documents and communications that form the basis of, or otherwise relate to, Brian K. Bond's personal knowledge of the information stated in paragraphs 7 and 13 of the [Bond affidavit].

This request seeks documents related to the relevant portions of Bond's affidavit.[13] Unlike the original CID, it zeroes in on the most relevant portion of the affidavit. Like all requests in the revised CID, this request incorporates the global consent of the Attorney General's

---

members and its desire to rely on that information as the basis of litigation advanced on their behalf. Litigation, particularly public-interest litigation over matters of broad public concern, is necessarily highly public, and parties who choose to engage in it necessarily subject their factual claims to searching scrutiny by their opponents.

[13] Paragraph 13 is the paragraph of the affidavit quoted above, *supra* at 19. Paragraph 7, however, merely lists PFLAG's local chapters throughout Texas. The Attorney General's office makes no effort in this Court to explain why discovery into PFLAG's organizational structure or its relationship with local chapters is relevant to any DTPA investigation. As with the sixth document request discussed below, *infra* at 32–33, we do not conclude based on the information before us that PFLAG must produce documents underlying Paragraph 7 of the affidavit.

29

office to PFLAG's redaction of information identifying the PFLAG members who communicated with PFLAG as described by Bond. Because a reasonable interpretation of Bond's testimony is that some of the conversations he describes may have contemplated the provision of continued treatments in violation of SB 14—violations which are a necessary factual predicate of the DTPA violations under investigation by the Attorney General's office—a request for documents related to his testimony is properly tailored to the subject matter of the investigation. PFLAG must provide responsive documents.[14]

The revised CID's second request seeks:

2. All communications to, or from, PFLAG's professional staff, non-members, or Affiliates regarding, relating to, or referencing, "contingency plans" and/or "alternative avenues to maintain care," as those phrases are used in the [Bond affidavit].

This request focuses on the principal statement in the affidavit that caused the Attorney General's office to believe PFLAG may have relevant documents. It seeks PFLAG's internal communications regarding or relating to that statement. Because Bond's statement is reasonably construed as a reference to potential violations of SB 14 that may form the predicate of a DTPA violation, discovery of further related communications is proper. PFLAG must produce responsive documents.

---

[14] With respect to each of the document requests, PFLAG's obligation to produce the documents on remand is subject to its right to produce a privilege log and establish, as to individual documents, the existence of a recognized privilege applicable in civil litigation, such as the attorney–client or work-product privilege. *See* TEX. R. CIV. P. 193.3.

The third request seeks:

3. All recommendations, referrals, and/or lists of pediatric and/or adolescent health care providers in Texas that PFLAG (or any of its professional staff or affiliates) has created, maintained, received, or distributed since March 8, 2023.

The affidavit indicates that families contacted PFLAG seeking "health care providers who specialize in medical care for gender dysphoria" in an effort to identify "alternative avenues to maintain care in Texas." Given that the Attorney General's office reasonably interprets these statements to contemplate a search for continued treatments in violation of SB 14, discovery of "recommendations, referrals, and/or lists of pediatric and/or adolescent health care providers" in PFLAG's possession is relevant to the subject matter of the investigation and is discoverable. PFLAG must produce responsive documents.

The fourth request seeks:

4. In reference to the [Bond affidavit], produce documents, meeting minutes, and communications sufficient to show the factual basis for the statement that "PFLAG families with transgender and nonbinary adolescents . . . have been asking chapters for alternative avenues to maintain care in Texas" (with PFLAG having the option to redact identifying member information in the manner described in Instruction No. 7).

This is a straightforward request for documents providing the factual basis for the key statement in the Bond affidavit. As with the first request, demands for documents related to a party's testimony are a common feature of discovery. The request is proper. PFLAG must produce responsive documents.

The fifth request seeks:

5. All communications to, or from, PFLAG's professional staff, non-members, or Affiliates regarding, relating to, or referencing any of the individuals or entities identified in the document attached hereto as "EXHIBIT B2" since March 8, 2023.

Exhibit B2 lists Texas Children's Hospital, Baylor College of Medicine, Seattle Children's Hospital, QMed/QueerMed, QueerDoc, and Plume Health, P.C. As the district court observed, these medical providers are apparently the targets of the Attorney General's investigation into possible DTPA violations involving circumvention of SB 14. Jdgmt. at 8. In other words, the DTPA investigation giving rise to the contested CID concerns whether these particular entities, and perhaps others, have deceptively concealed violations of SB 14. Given PFLAG's potential involvement in seeking "alternative avenues to maintain care in Texas" as reflected in the Bond affidavit, the Attorney General's office reasonably believes that PFLAG's communications regarding the entities under investigation may contain relevant evidence. However, because PFLAG and some of the listed entities have a multi-state scope, the request should be limited to communications related to Texas. With that caveat, PFLAG must produce responsive documents.

The sixth request seeks:

6. All contractual and charter agreements between PFLAG's Texas chapters and national chapter.

Unlike the first five requests, the relevance of this request to the subject matter of the Attorney General's investigation is not readily apparent. The Attorney General's office acknowledges that PFLAG

32

itself is not a target of the investigation. It makes no effort in this Court to explain the relevance to its DTPA investigation of the relationship between Texas PFLAG chapters and the national organization. In the absence of any argument in support of this request, we do not conclude that PFLAG must produce responsive documents. On remand, the Attorney General's office may re-urge this request, which should be considered in light of the standards stated in this opinion.

The seventh request seeks:

7.  The governing documents and bylaws of PFLAG's Texas chapters and national chapter.

Like the sixth request, the Attorney General's office does not defend this request in this Court. The district court's order indicates that it has already ordered PFLAG "to provide the governing documents and bylaws in its possession." We see no contention otherwise from the Attorney General's office. We do not conclude that PFLAG must produce documents responsive to this request. On remand, the Attorney General's office may re-urge this request, which should be considered in light of the standards stated in this opinion.

### III.

The district court's "Final Declaratory Judgment and Injunction" is reversed. The matter is remanded to that court for proceedings consistent with this opinion. PFLAG shall produce responsive documents as described herein, subject to assertions of a recognized privilege. Assertions of privilege should be consistent with this opinion

33

and should comport with Rule 193.3 of the Texas Rules of Civil Procedure.

 

James D. Blacklock
Chief Justice

**OPINION DELIVERED:** March 13, 2026